UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CAPTIAL RECOVERY GROUP      )
TECHNOLOGIES, LLC, d/b/a CRG   )
Automation,                         )     Civil Action No. 3:24-CV-349-CHB
                                  )
      Plaintiff,              )
                                  )     **MEMORANDUM OPINION**
v.                               )          **AND ORDER**
                                  )
KENNETH TINNELL, *et al.*,       )
                                  )
      Defendants.         )

                         \*\*\*    \*\*\*    \*\*\*    \*\*\*

This matter is before the Court on Defendant Kenneth Tinnell's Motion to Compel Arbitration, [R. 79]. Plaintiff Capital Recovery Group Technologies ("CRGT") filed a response, [R. 81], and Tinnell replied. [R. 82]. With leave of Court, CRGT filed a sur-reply. [R. 96]; [R. 97]. The matter is therefore fully briefed and ripe for review. For the reasons set forth below, the Court will deny the Motion to Compel Arbitration, [R. 79].

## I.     BACKGROUND

Defendant Tinnell previously served as the president of CRGT from approximately September 2022 to May 17, 2024. [R. 50, 54:15–18 (August 28, 2024 Hrg. Transcript)]. Shortly before beginning his employment with CRGT, Tinnell signed a Mutual Confidentiality Agreement. [R. 1-1]. Pursuant to that agreement, Tinnell agreed to, among other things "maintain as fully confidential from third parties" all confidential information, as defined in the agreement, and "not to disclose, divulge or use same, directly or indirectly, save exclusively for the purposes for which it was disclosed." *Id.* ¶ 2.1; *see also id.* ¶¶ 2.2, 5.1, 5.2, 6.

- 1 -

On June 12, 2024, shortly after Tinnell's termination, CRGT filed its Verified Complaint in this Court. [R. 1]. CRGT alleges that, prior to and after leaving CRGT, Tinnell misappropriated and continues to misappropriate "highly confidential and proprietary trade secrets" to benefit Defendant Tidas, LLC, a company owned by Tinnell, and Defendant Nova Dry Kiln, LLC, a company owned by Tinnell's brother-in-law. *Id.* ¶¶ 1, 32–39, 47–64. It asserts claims for violation of the federal Defend Trade Secrets Act (Count 1, against all defendants); violation of the Kentucky Uniform Trade Secrets Act (Count 2, against all defendants); breach of fiduciary duty (Count 3, against Tinnell); aiding and abetting breach of fiduciary duty (Count 4, against Tidas, LLC and Nova Dry Kiln, LLC); breach of the Mutuality Confidentiality Agreement (Count 5, against Tinnell); tortious interference with contract (Count 6, against Tidas, LLC and Nova Dry Kiln, LLC); theft by unlawful taking under Kentucky law (Count 7, against Tinnell and Tidas, LLC); unjust enrichment (Count 8, against all defendants); and quantum meruit (Count 9, against all defendants). *Id.* ¶¶ 65–151.

On June 14, 2024, CRGT filed a Motion for Temporary Restraining Order, Preliminary Injunction, an Expedited Hearing, and Expedited Discovery, alleging that Defendants continued to misappropriate CRGT's trade secrets and confidential information and seeking to enjoin them from doing so. [R. 5]. The Court set a hearing date, [R. 15], and discussed the motion with the parties at a June 26, 2024 telephonic status conference. [R. 18]. The parties advised that they would discuss the possibility of an agreed order to resolve the request for a temporary restraining order, and they ultimately filed a proposed agreed order with the Court. [R. 19].

In that order, which the Court granted, the Defendants agreed not to use or disclose certain documents and information and further agreed not to destroy any potentially discoverable information or evidence. [R. 20]. The parties also agreed to "engage in a period of expedited

discovery," including "up to four depositions" and ten requests for production of documents. *Id.* at 1. The parties agreed that the depositions "would focus on the issues for the preliminary injunction hearing, and each side would have the right to depose the witnesses later on the merits in regular discovery." *Id.* Similarly, the written discovery requests would be "limited to the scope of the issues for the preliminary injunction hearing" and "would not count against any limits on traditional discovery." *Id.* at 1–2.

Shortly thereafter, on July 5, 2024, Defendants Tinnell and Tidas, LLC filed their answer to CRGT's complaint. [R. 23]. In a thirty-paragraph "Affirmative Defenses" section, *id.* at 42–44, they raised a number of defenses, including that "[CRGT's] claims may be subject to binding arbitration." *Id.* at 42, ¶ 9.

In that same filing, in a seventy-five paragraph counterclaim section, Tinnell and Tidas, LLC also asserted three counterclaims: failure to timely pay wages in violation of Kentucky Revised Statute ("KRS") § 337.020; failure to timely pay wages in violation of KRS § 337.055; and breach of contract. [R. 23, pp. 49–51]. In support of these counterclaims, they alleged that Tinnell and CRGT's CEO, James DeSmet, agreed that Tinnell would be employed as president of CRGT, that he would be paid a base annual salary of $250,000 plus, if applicable, sales commissions and an annual performance bonus, and that he would be compensated for twelve months' worth of base salary, plus unpaid bonuses, sales commissions, and unused vacation time, if he were to be terminated. *Id.* at 45–46. Tinnell and Tidas, LLC allege that these were memorialized in a written agreement (hereafter, the "Employment Agreement"). *Id.* at 46; *see also* [R. 23-2 (Employment Agreement)]. They allege that CRGT provided Tinnell with a version of the written agreement in September 2022, but he did not sign it at that time "and the Parties continued to negotiate the terms." [R. 23, p. 46]. They then allege that, in October 2022, DeSmet

- 3 -

emailed Tinnell with a final version of the Employment Agreement, which Tinnell eventually signed and provided to Desmet. *Id.* While DeSmet did not provide a signed copy to Tinnell, the defendants allege that "[CRGT] and Tinnell have always acted under the Employment Agreement." *Id.* Specifically, they allege that Tinnell was paid his prorated base salary for the remainder of 2022, and his full base salary and a performance bonus in 2023. *Id.* However, Tinnell and Tidas, LLC allege that CRGT failed to pay him his 2024 salary after he was terminated in May 2024. *Id.* at 48.

Of relevance here, the Employment Agreement also contains an arbitration provision. Section 12 of that agreement states,

> If the Company or Executive shall dispute any termination of Executive's employment hereunder or if a dispute concerning any payment hereunder shall exist either party shall have the right (but not the obligation), in addition to all other rights and remedies provided by law, to compel binding, enforceable and non-appealable arbitration of the dispute in Jefferson County, Kentucky under the rules of the American Arbitration Association by giving notice of arbitration to the other party within thirty (30) days after notice of such dispute has been received by the party to whom notice has been given . . . .

[R. 23-2, ¶ 12].

On August 28, 2024, the Court held a six-hour hearing on CRGT's request for preliminary injunction. [R. 47]; [R. 50]. The parties were unable to complete the presentation of their evidence, however, and agreed to continue the hearing on October 10, 2024. [R. 48]; [R. 66]. The second day of the hearing lasted approximately three hours, *see* [R. 63]. At its conclusion, counsel for Tinnell and Tidas, LLC referenced the Employment Agreement and their breach of contract counterclaim and, for the first time, mentioned the possibility of pursuing *that claim* in arbitration:

> . . . we have a claim for breach of the Employment Agreement and not paying him. There's an arbitration provision that, obviously, doesn't carve out this Court's ability to do a preliminary injunction hearing, but post this hearing, we intend to file an arbitration claim on the breach of employment contract [counterclaim].

- 4 -

[R. 66, 145:3–8].

The Court ultimately continued the preliminary injunction hearing to a third day, set for January 29, 2025. [R. 69]. Shortly before that hearing date, however, the parties submitted a proposed agreed order resolving the motion for preliminary injunction. [R. 71]. The Court granted that agreed order and denied the motion for preliminary injunction as moot. [R. 72]. The Court then referred the matter to a magistrate judge, [R. 73], and entered an Order for Meeting and Report that required the parties to conduct a Federal Rule of Civil Procedure 26 conference to discuss, among other things, a discovery plan. [R. 74].

The parties submitted their Rule 26(f) report on February 1, 2025. [R. 75]. In that report, the parties briefly described the facts and issues in the case, including a detailed paragraph about Tinnell and Tidas, LLC's counterclaims. *Id.* ¶ 2(b)(ii). That paragraph ends, "Tinnell intends to file his claims relating to the compensation owed to him under the Employment Agreement in Arbitration in the near future." *Id.* The Rule 26(f) report also advised that the parties had previously engaged in discovery relating to the preliminary injunction motion, and "[i]n light of the parties' agreement that prompt settlement is possible, the parties respectfully submit that a proposed discovery plan is unnecessary at this time." *Id.* ¶ 2(c).

On February 14, 2025,[1] Tinnell filed a Demand for Arbitration with the American Arbitration Association. [R. 79-6].[2] The American Arbitration Association then sent a letter to the parties, advising of the fees owed by each. [R. 79-7]. CRGT responded by letter dated March 5, 2025, declining to pay the $2,100 fee. [R. 79-8].

---

[1] The parties agree that Tinnell filed this demand on February 14, 2025. [R. 79, p. 6]; [R. 81, p. 15].

[2] To the extent the page number listed on a filing conflicts with the page number assigned by the Court's electronic docketing system, the Court references the page number assigned by the docketing system.

Given the parties' earlier representations about a potential settlement, the magistrate judge then scheduled a settlement conference for April 8, 2025. [R. 77]. On April 7, 2025, the day prior to the scheduled settlement conference, Tinnell filed his Motion to Compel Arbitration, seeking to compel arbitration of his counterclaims.[3] [R. 79]. Nevertheless, the settlement conference took place as scheduled on April 8, 2025, but the parties were unable to reach an agreement.[4] [R. 80]. The magistrate judge continued to hold ex parte calls and conducted multiple telephonic status conferences. *See, e.g.*, [R. 86]; [R. 87]; [R. 88]. The parties ultimately agreed to an "interim" discovery schedule while the Motion to Compel Arbitration was under consideration. [R. 89]; [R. 91]. Those deadlines have since been extended. [R. 95].

Meanwhile, CRGT filed a response to the Motion to Compel Arbitration. [R. 81]. Tinnell replied. [R. 82]. With leave of the Court, CRGT filed a sur-reply. [R. 96]; [R. 97]. The motion is therefore fully briefed and ripe for review.

## II.     ANALYSIS

In his motion, Tinnell seeks to compel arbitration under the Federal Arbitration Act, ("FAA"). [R. 79, pp. 6–7]. The FAA "establishes a liberal policy favoring arbitration agreements." *Johnson v. HCL America, Inc.*, 5:24-cv-000380-GFVT, 2025 WL 3252399, at *2 (E.D. Ky. Nov. 18, 2025) (quoting *Parker v. Tenneco, Inc.*, 114 F.4th 786, 792 (6th Cir. 2024)) (internal quotation marks omitted). It "provides two routes by which a party may invoke arbitration." *Boykin v. Family*

---

[3] Tinnell seeks to compel arbitration of his "claims relating to his termination or his compensation through arbitration," [R. 79-9], and the Court therefore understands that he seeks to compel arbitration only of his counterclaims. *See also* [R. 79-6 (Demand for Arbitration)]; [R. 79, p. 11 (referencing his statutory and breach of contract claims)].

[4] To be clear, neither CRGT nor the Court relies on the parties' engagement in settlement discussions when considering waiver. The Sixth Circuit has made clear that it is "reluctant to infer waiver based on settlement-related activities." *Schwebke v. United Wholesale Mortgage LLC*, 96 F.4th 971, 976 (6th Cir. 2024) (citation omitted). Moreover, "participation in magistrate-judge-facilitated settlement discussions [does not] involve the district court acting *as* a district court, which would be more relevant to the waiver analysis." *Id.* (citation omitted).

*Dollar Stores of Michigan, LLC*, 3 F.4th 832, 836 (6th Cir. 2021) (citing 9 U.S.C. §§ 3, 4); *see also Kloosterman v. Metropolitan Hospital*, 153 F. 4th 501, 505 (6th Cir. 2025) ("Two sections of the [FAA] establish federal procedural rules for arbitration." (citing 9 U.S.C. §§ 3, 4)). Section 3 allows a party, usually a defendant, to seek arbitration of "any issue" pending in an existing federal lawsuit or proceeding, resulting in a stay of the case. 9 U.S.C. § 3; *Boykin*, 3 F.4th at 836; *Kloosterman*, 153 F.4th at 505. Section 4, on the other hand, "on its face applies when no federal case exists," and "it gives a plaintiff the right to 'petition' a federal court for an order compelling the other side to arbitrate a dispute." *Kloosterman*, 154 F.4th at 505 (citing 9 U.S.C. § 4). Nevertheless, "courts have long allowed defendants in a pending federal case not just to stay the case under § 3, but also to move to compel arbitration under § 4." *Id.* (citing *Boykin*, 3 F.4th at 836–37).

Here, Tinnell cites both §§ 3 and 4 of the FAA. [R. 79, pp. 6–7]. He seeks relief in a pending lawsuit and appears to request a stay of the matter pending arbitration, *see* [R. 79-9 (Proposed Order)], suggesting that § 3's procedures apply. *See Kloosterman*, 153 F.4th at 507. But he also seeks an order compelling CRGT to arbitrate, suggesting that § 4 applies. *Boykin*, 3 F.4th at 837. Regardless, "the Supreme Court has long held that the same procedural rules apply under both sections." *Kloosterman*, 153 F.4th at 507. Thus, the same waiver (or default)[5] analysis applies under both §§ 3 and 4. *Id.*

---

[5] The FAA uses the term "default." 9 U.S.C. § 3 (authorizing stay of proceeding pending arbitration "providing the applicant for the stay is not in default in proceeding with such arbitration"). The Sixth Circuit has questioned whether the proper terminology is "waiver," "forfeiture," or "default." *See Kloosterman*, 153 F.4th at 506–07; *In re Chrysler Pacifica Fire Recall Prods. Liability Litig.*, 143 F.4th 718, 722, n.1 (6th Cir. 2025); *Schwebke*, 96 F.4th at 974, n.1. "But," the Sixth Circuit has explained, "courts and litigants generally use the term 'waiver' of arbitration." *Chrysler*, 143 F.4th at 722, n.1 (citing *Schwebke*, 96 F.4th at 974, n.1); *see also Cobble v. T-Mobile Sprint*, 3:21-cv-000415-RGJ-RSE, 2024 WL 1251339, at *7 (W.D. Ky. Mar. 22, 2024) (explaining that the Sixth Circuit and every other circuit that has considered the issue has interpreted, or implicitly treated, the meaning of "default" under the FAA as a waiver of the right to arbitrate). Here, "[i]n the interest of uniformity, and because this distinction is not material to" this Court's analysis, this Court also uses the term "waiver." *Chrysler*, 143 F.4th at 722, n.1.

Historically, federal courts, including the Sixth Circuit, applied a two-prong test to determine whether a party had waived its contractual right to arbitrate by participating in litigation. *Schwebke v. United Wholesale Mortgage LLC*, 96 F.4th 971, 974 (6th Cir. 2024). First, courts would consider whether the party had taken actions inconsistent with its reliance on an arbitration agreement. *Id.* (citing *Hurley v. Deutsche Bank Tr. Co. Americas*, 610 F.3d 334, 338 (6th Cir. 2010)). Next, courts would ask whether the party's delay in asserting a right to arbitrate caused the opposing party to suffer actual prejudice. *Id.* (citing *Hurley*, 610 F.3d at 338). Unless the moving party's conduct prejudiced the opposing party, courts typically did not find waiver of the right to arbitrate. *Schwebke*, 96 F.4th at 974 (citations omitted).

This "prejudice requirement was thought to flow from the [FAA's] 'policy favoring arbitration.'" *Id.* (quoting *Morgan v. Sundance, Inc.*, 596 U.S. 411, 414 (2022)). However, in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), the Supreme Court clarified that "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration." *Id.* at 418. As such, the Supreme Court abrogated the prejudice prong of the waiver analysis. *Id.* Now, "courts asking whether a party has waived a right to arbitrate should not make harm to others a prerequisite. Instead, they should apply ordinary waiver rules, looking for the 'intentional relinquishment or abandonment of a known right.'" *Schwebke*, 96 F.4th at 974 (quoting *Morgan*, 596 U.S. at 417).

After *Morgan*, "the Sixth Circuit has assumed that the first element of its waiver test survived *Morgan*." *Johnson*, 2025 WL 3252399, at *4 (citing *In re Chrysler Pacifica Fire Recall Prods. Liability Litig.*, 143 F.4th 718, 723 (6th Cir. 2025)); *see also Kloosterman*, 153 F.4th at 506. "That is, a party waives its right to arbitrate when it 'takes actions that are completely inconsistent with any reliance on an arbitration agreement.'" *Johnson*, 2025 WL 3252399, at *4

(quoting *Chrysler*, 143 F.4th at 723–24). In applying this test, the Court must consider the totality of the circumstances, and "there is no bright line at which a party has waived its right to arbitrate." *Id.* (citing *Schwebke*, 96 F.4th at 975). However, courts have identified a number of factors to consider, including "when and how the party raised the arbitration issue, the overall progress of the case when they filed the motion to compel arbitration, and whether the party made any 'affirmative requests for relief' before moving to compel arbitration." *Id.* (citing *Schwebke*, 96 F.4th at 975–76).

Indeed, "waiver can be established through 'either the actual intent to relinquish an opportunity or course of action *or* conduct that would warrant such an inference.'" *Avient Corp. v. Westlake Vinyls, Inc.*, 5:22-CV-051-CHB, 2024 WL 4363276, at *10 (W.D. Ky. Sept. 30, 2024) (quoting *Stevens-Bratton v. TruGreen, Inc.*, No. 2:15-CV-2472, 2020 WL 3086571, at *4 (W.D. Tenn. June 10, 2020)) (emphasis added in *Avient*). For example, where a defendant waited eight months before moving to compel arbitration, did not raise arbitration as an affirmative defense, asserted a counterclaim, and participated in discovery, among other things, the Sixth Circuit has found waiver. *Johnson Associates Corp. v. HL Operating Corp.*, 680 F.3d 713, 717–719 (6th Cir. 2012); *see also Schwebke*, 96 F.4th at 975 (discussing *Johnson Associates*). With these general principles in mind, the Court turns to the parties' waiver arguments.[6]

Tinnell first argues that he has "consistently notified the Court and [CRGT] that he intended to bring his claims under the Employment Agreement in Arbitration." [R. 79, p. 12].

---

[6] Neither party argues that the issue of waiver itself must be submitted to arbitration. Moreover, the Sixth Circuit has "presume[d] judicial resolution of gateway questions such as waiver, even where . . . the parties have agreed to a broadly applicable arbitration clause." *Johnson v. HCL America, Inc*., No. 5:24-cv-000380-GFVT, 2025 WL 3252399, at *3 (E.D. Ky. Nov. 18, 2025) (citing *In re Chrysler Pacifica Fire Recall Prods. Liability Litig.*, 143 F.4th 718, 722–23 (6th Cir. 2025)); *see also Creason v. Experian Information Solutions, Inc.*, 722 F. Supp. 3d 760, 764 (W.D. Ky. Mar. 21, 2024). Further, the arbitration clause itself does not suggest that the parties agreed to arbitrate questions of waiver or enforceability. *See* [R. 23-2, ¶ 12]; *Creason*, 722 F. Supp. 3d at 764.

CRGT, on the other hand, insists that Tinnell waived arbitration by litigating his counterclaims in this Court, and failing to assert the right to arbitration of those counterclaims in his affirmative defenses. [R. 81, p. 14]. On this point, CRGT points out that, in his affirmative defenses, Tinnell asserted only that *CRGT*'s claims "may be subject to binding arbitration," but made no mention of his right to seek arbitration of his *own counterclaims*. *Id.* (citing [R. 23, p. 42]). Instead, CRGT argues, Tinnell raised that issue—that is, his intention to arbitrate his counterclaims—for the first time on October 10, 2024, at the conclusion of the second day of the preliminary injunction hearing. *Id.* at 15; *see also* [R. 66, 145:3–8]. Even then, CRGT notes, Tinnell did not file his demand for arbitration with the American Arbitration Association until February 14, 2025, over seven months after first asserting his counterclaims. [R. 81, p. 15]; *see also* [R.79-6 (Demand for Arbitration)]. And he did not move to compel arbitration in this Court until April 7, 2025. *See* [R. 81, p. 15]; [R. 79].

In the meantime, CRGT argues, Tinnell "litigated his counterclaim in this Court." [R. 81, p. 15]. Specifically, CRGT points to Tinnell's arguments opposing its request for injunctive relief, arguing that the Employment Agreement "was central to Tinnell's argument opposing a temporary restraining order." *Id.* Moreover, CRGT argues, while the parties agreed to engage in limited discovery related to the preliminary injunction motion, "Tinnell's discovery requests to [CRGT] focused on his employment claims." *Id.* at 16. During this expedited discovery period, Tinnell and Tidas, LLC produced approximately 180,000 documents, and the parties conducted eight depositions, with Tinnell's deposition of DeSmet and other CRGT employees "center[ing] on his counterclaim[s]." *Id.* at 17, 18. Likewise, CRGT argues, Tinnell's pre-hearing brief focused on his employment claims and the Employment Agreement. *Id.* at 19 (citing [R. 33]).

In response, Tinnell insists that he put CRGT on notice of his intent to pursue his compensation claims as early as May 2024, in an email exchange predating this federal lawsuit. [R. 82, pp. 11, 14]. Then, he argues, he put CRGT and all parties on notice by asserting his right to arbitration in his affirmative defenses, and again at the October 10, 2024 hearing. *Id.* at 11. "Moreover," Tinnell argues, he "did not engage in any discovery on the claims relating to his compensation that he seeks to arbitrate." *Id.* at 14.

To evaluate these arguments, the Court turns to recent case law within this circuit, starting with *Schwebke v. United Wholesale Mortgage LLC*, 96 F.4th 971 (6th Cir. Mar. 27, 2024). In that case, the plaintiff sued his employer for disability discrimination. *Id.* at 973. The defendant-employer filed an answer, and for almost seven months, the parties "engaged in extensive discovery," including a discovery conference, written discovery, the filing of a joint discovery plan, the defendant's production of tens of thousands of pages of documents, defendant's issuance of fourteen third-party subpoenas for records, multiple depositions, the defendant's filing of a witness list, and the parties' agreement to extend the discovery deadlines. *Id.* Before the extended deadline expired, the defendant filed a motion seeking to compel arbitration. *Id.* After it filed the motion, it produced three more witnesses for deposition, served two more third-party subpoenas, and produced more documents in discovery. *Id.* The district court found these actions inconsistent with the right to arbitrate and denied the motion to compel. *Id.*

The Sixth Circuit affirmed. In doing so, it compared the facts of *Schwebke* to the facts in an earlier Sixth Circuit decision, *Johnson Associates Corp. v. HL Operating Corp.*, 680 F.3d 713 (6th Cir. 2012). *See Schwebke*, 96 F.4th at 975 (discussing *Johnson Associates*). In *Johnson Associates*, the defendant

- 11 -

> (1) waited eight months before moving to compel arbitration; (2) did not raise arbitration as an affirmative defense; (3) asserted other affirmative defenses; (4) asserted a counterclaim; (5) participated in a case management conference; (6) participated in settlement discussions facilitated by a magistrate judge; (7) filed a case management order; (8) served interrogatories and requested documents; (9) noticed eight depositions; and (10) agreed to extend the discovery deadline.

*Id.* at 975 (citing *Johnson Associates*, 680 F.3d at 715–16). The Sixth Circuit held that this conduct "considered together" was "completely inconsistent with reliance on arbitration." *Id.* (quoting *Johnson Associates*, 680 F.3d at 719) (internal quotation marks omitted). In reaching this conclusion, the Sixth Circuit emphasized that the defendant "failed to raise arbitration in its answer," "asserted a counterclaim," "and actively scheduled and requested discovery, including depositions, rather than moving to compel arbitration following the end of formal settlement discussions." *Id.* (quoting *Johnson*, 96 F.4th at 718–19) (internal quotation marks omitted).

In *Schwebke*, the defendant had acted similarly, where it

> (1) waited seven months before moving to compel arbitration; (2) did not raise arbitration as an affirmative defense; (3) raised other affirmative defenses; (4) participated in a discovery conference; (5) filed a joint discovery plan; (6) served interrogatories and requested documents; (7) noticed two depositions; and (8) agreed to an extension of the discovery deadline.

*Id.* Moreover, the defendant "engaged in conduct beyond what occurred in *Johnson Associates*." *Id.* In *Johnson Associates*, the defendant had actively scheduled and requested discovery responses, but no written responses had been exchanged and no depositions had taken place when the defendant moved to compel arbitration. *Id.* (citation omitted). By contrast, in *Schwebke*, "far more extensive discovery was *nearly complete*." *Id.* True, the defendant in *Schwebke* had not filed a counterclaim, like the defendant in *Johnson Associates*. *Id.* at 976. But, the Sixth Circuit made clear, "the waiver analysis rests on the totality of the circumstances—not any bright line rule." *Id.* (citation omitted). Considering the totality of the circumstances, the Sixth Circuit held that the

defendant "implicitly waived its right to compel arbitration because its conduct was completely inconsistent with reliance on its arbitration right." *Id.* at 977; *see also Schnatter v. 247 Group, LLC*, No. 3:20-CV-3-BJB, 2024 WL 4369898, at *1 (W.D. Ky. Sept. 30, 2024) (denying motion to compel arbitration where "[a]lmost half a decade, tens of thousands of pages of discovery, and handfuls of motions (some dispositive) came and went before [the defendant] filed a motion to arbitrate").

In a more recent case out of the United States District Court for the Eastern District of Kentucky, the district court granted a motion to compel arbitration, finding that no waiver occurred. In that case, *Johnson v. HCL America, Inc.*, 5:24-cv-000380-GFVT, 2025 WL 3252399 (E.D. Ky. Nov. 18, 2025), the plaintiff sued its employer, but the defendant removed the case to federal court and timely filed an answer that raised arbitration in its affirmative defenses. *Id.* at *2, *5. It seems that, at this point in the proceedings, the parties were aware of a potential Dispute Resolution Agreement, but it was not clear if the plaintiff had signed the agreement or opted out of it. *See id.* at *5. The parties then exchanged written discovery requests, and one third-party subpoena was issued. *Id.* at *2. During discovery, the defendant found the plaintiff's Dispute Resolution Agreement and, when opposing counsel did not agree to proceed with arbitration, it filed a motion to compel, approximately seven months after raising arbitration in its answer. *Id.*

In addressing the parties' waiver arguments, the district court noted that the defendant raised arbitration as one of its twenty-four affirmative defenses "and even stated that it did not waive enforcement of the arbitration agreement." *Id.* at *4. While the defendant did not mention arbitration again for several months, the defendant produced an unsigned copy of the Dispute Resolution Agreement to the plaintiff in discovery "while [it] took steps to ensure that [the plaintiff] had signed—and had not opted out of—the Agreement." *Id.* at *4, 5. Moreover, the case

- 13 -

was still in its "early stages," only "some discovery" had been exchanged, no dispositive motions had been filed, and to the extent the parties engaged in a Rule 26(f) planning meeting and exchanged discovery, such action had been ordered by the court. *Id.* This distinguished the case from *Schwebke*, the district court explained, because the parties in that case engaged in significantly more discovery, and the defendant had not raised arbitration as an affirmative defense. *Id.* at *5. Still, the district court expressed concern that perhaps the defendant's delay in seeking arbitration was an attempt to gain a tactical advantage by engaging in discovery that would not be available in arbitration. *Id.* at *4. Such behavior would support a finding of waiver. *Id.* (citing *Schwebke*, 96 F.4th at 977). Nevertheless, under the totality of the circumstances, the district court granted the motion to compel.

Tinnell also points us to a case out of this Court, *Wilson v. CPB Foods, LLC*, 3:18-CV-14-CHB, 2018 WL 6528463 (W.D. Ky. Dec. 12, 2018). In that case, the plaintiff signed an arbitration agreement through his employment with the defendant, but nevertheless filed suit in federal court, alleging that the defendant-employer had violated the Americans with Disabilities Act. *Id.* at *1–2. The defendant answered, asserting some affirmative defenses, preserving other affirmative defenses contained in the Federal Rules of Civil Procedure, and reserving the right to add additional affirmative defenses. *Id.* at *2. The parties engaged in a discovery planning conference, submitted their proposed discovery plan, and "engage in a period of discovery." *Id.* The plaintiff's deposition was scheduled, but the defendant canceled it, citing to the arbitration agreement. *Id.* The defendant then filed a motion to compel arbitration. *Id.*

In addressing the parties' waiver arguments, the Court relied on the two-part test in effect at that time, that is, it considered whether the defendant had acted completely inconsistently with its reliance on the arbitration agreement and whether the defendant's delay in asserting the right to

- 14 -

arbitrate caused actual prejudice to the opposing party. *Id.* at *5. The Court first disposed of the argument that the defendant's prelitigation conduct constituted waiver. *Id.* Turning to the defendant's conduct *after* litigation commenced, the Court noted that only five months had elapsed between the filing of the case and the motion to compel. *Id.* at *6. The Court explained,

> While the Court agrees that these actions [i.e., engaging in discovery] are inconsistent with reliance upon the parties' Arbitration Agreement, the Court does not find enough time passed between these inconsistent actions and when [the defendant] ultimately relied on the Arbitration Agreement to render its reliance on the agreement untimely. The case was still in its infancy, and only written discovery had been exchanged. It cannot be said that [the defendant] waived reliance on the Arbitration Agreement at this early stage.

*Id.*; *see also In re AME Church Employee Retirement Fund Litigation*, No. 1:22–md–03035–STA–jay, 2023 WL 8586341, at *15 (W.D. Tenn. Dec. 11, 2023) (declining to find waiver where the party's delay in seeking litigation "ran on for a matter of months, not years"; it raised its request for a stay "during the discovery phase of the case and in the process of the parties still framing their pleadings"); *Heritage Foundation, Inc. v. Wasatch Railroad Contractors*, 6:18-CV-249-CHB, 2019 WL 12117037, at *5 (finding that the defendant had not acted inconsistently with its right to seek arbitration where it notified the plaintiff that it would pursue its legal rights to collect amounts owed it, then, when the plaintiff filed suit in state court first, it removed the lawsuit to federal court within seventeen days of service and then filed the motion to compel arbitration one week later).

The Court finds the present matter falls somewhere between the *Schwebke* and *Johnson Associates* line of cases, where the Sixth Circuit found waiver, and the *Johnson v. HCL America* and *Wilson* line of cases, where district courts have declined to find waiver. Beginning with when and how Tinnell raised the arbitration issue, he claims in his reply brief that he notified CRGT of "his intent to pursue compensation" in May 2024, via email. [R. 82, p. 11]. The Court has reviewed

- 15 -

that email chain, however, and finds no mention of arbitration. [R. 79-5]. Instead, Tinnell sought "clarity on a few important matters related to [his] recent termination," namely, the process and timeline for receiving his severance package, information on back pay allegedly owed and "commissions on revenue," and "how the previously earned Phantom Stock from last year will be managed moving forward." *Id.* at 2. He followed up with an email attaching the Employment Agreement and quoting from Section 6 of that agreement, which related only to compensation. *Id.* Despite attaching the Employment Agreement, he made no mention of the arbitration provision contained therein, nor made any references to arbitration. *See id.* Moreover, he made no mention of pursuing litigation or other legal avenues of relief, and instead stated that he was "keen to ensure a smooth and amicable resolution to these outstanding items." *Cf. Heritage Foundation*, 2019 WL 12117037, at *5 (declining to find waiver where the defendant, among other things, had notified the plaintiff prior to litigation that it would pursue its legal rights to collect amounts owed it).

Nevertheless, Tinnell also argues that he raised the issue of arbitration in his affirmative defenses, a fact that typically weighs against waiver. *See, e.g.*, *Schwebke*, 96 F.4th at 975 (noting that the defendant "did not raise arbitration as an affirmative defense" despite "rais[ing] other affirmative defenses"); *Johnson*, 2025 WL 3252399, at *5 (noting that the defendant "did plead arbitration as an affirmative defense in its answer and even specifically stated that it did not waive enforcement of the arbitration agreement," thereby putting the plaintiff "on notice of the potential for arbitration"). But Tinnell mischaracterizes the record. In his affirmative defenses, Tinnell asserted that *CRGT's claims* may be subject to arbitration. [R. 23, p. 42, ¶ 9]. CRGT's claims relate to Tinnell's alleged misappropriation and misuse of confidential information and trade secrets. *See generally* [R. 1]. Tinnell's counterclaims, on the other hand, relate to CRGT's alleged failure to pay his compensation under the Employment Agreement. *See generally* [R. 23, pp. 49–51]. Putting

- 16 -

CRGT on notice that its claims relating to trade secrets and confidential information "may be subject to arbitration" does not put CRGT on notice of the potential for arbitration of Tinnell's counter claims relating his unpaid compensation.[7] Simply put, Tinnell's affirmative defenses made no reference to the arbitrability of his own counterclaims. Instead, he raised that issue for the first time on October 10, 2024, at the conclusion of the second day of the preliminary injunction hearing, and over seven months after filing his answer and counterclaims. [R. 66, 145:3–8]. In this sense, this case is more like *Schwebke*, where the moving party failed to raise arbitration as an affirmative defense. *Schwebke*, 96 F.4th at 973 (noting that the defendant did not raise arbitration in its answer, despite raising other affirmative defenses, and instead raised the issue for the first time six months later by motion).

Moreover, while the Court acknowledges that Tinnell mentioned arbitration no later than October 10, 2024, and even assuming he adequately expressed his intent in his affirmative defenses, thereby expressing a "general intent" to pursue his counterclaims in arbitration, "the simple fact is that [he] did not" attempt to do so for several more months. *Bradford v. Team Pizza, Inc.*, 349 F.R.D. 313, 318 (S.D. Ohio May 21, 2025). A party's statement "that it has a right to arbitration in pleadings or motion is not enough to defeat a claim of waiver." *Id.* (quoting *Solo v. UPS Co.*, 947 F.3d 968, 976 (6th Cir. 2020), *abrogated on other grounds by Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022)). Indeed, other courts have found that a waiver finding is *supported* by the moving party's decision not to move to compel arbitration for some time after having stated

---

[7] Moreover, given the very narrow scope of the arbitration provision of the Employment Agreement, this statement does not even put CRGT on notice of Tinnell's intent to rely on that specific arbitration provision, for CRGT's claims (which do not relate to a dispute over Tinnell's termination or his compensation) or his own counterclaims. *See* [R. 23-2, ¶ 12 ("If the Company or Executive shall dispute any termination of Executive's employment hereunder or if a dispute concerning any payment hereunder shall exist. . . .")].

an intent to do so, "because it clearly demonstrates their awareness of the right during the times in which they took actions inconsistent with it." *Id.*

This brings the Court to its next consideration, namely, the progress of the case when Tinnell moved to compel arbitration. As noted above, on June 25, 2024, the parties agreed to engage in a period of expedited discovery. *See* [R. 19]; [R. 20]. Tinnell does not dispute that the parties engaged in this discovery, nor does he dispute CRGT's description of the volume of discovery. For example, CRGT states that Tinnell and Tidas, LLC produced approximately 180,000 documents, and the parties conducted eight depositions, four of which were of CRGT employees noticed by Tinnell. [R. 81, pp. 17, 18]; *see also* [R. 81-3 (Tinnell's Deposition Notices)]. Instead, Tinnell argues that this discovery related only to CRGT's preliminary injunction claims. [R. 82, p. 14]. Specifically, he states that he "did not engage in any discovery on the claims relating to his compensation that he seeks to arbitrate." *Id.*

The record belies this assertion. True, the parties' agreed order regarding that initial round of discovery attempted to limit the scope to "issues for the preliminary injunction hearing." [R. 20, p. 1]. But a review of Tinnell's discovery requests reveals the actual scope of the parties' discovery. Tinnell sought information relating to his termination, the Employment Agreement, and importantly, *his compensation*, discovery that clearly went beyond the preliminary injunction issues relating to his alleged misappropriation of confidential information and trade secrets, and which instead was plainly targeted at his counterclaims. *See, e.g.,* [R. 81-1, 39:1–25, 42:1–25, 43:1–3 (DeSmet Deposition Excerpt) (discussing Tinnell's salary and annual cash bonuses under the Employment Agreement, as well as his termination and right to a severance package under the agreement)]; [R. 81-2 (Tinnell's Requests for Production of Documents)]; [R. 81-4, 62:4–25, 66:1–25; 109:1–25, 110:1–7 (Brian Pierson Deposition Excerpt) (discussing Tinnell's

- 18 -

compensation)]. For example, in his Requests for Production of Documents, he requested "[a]ll Documents relating to the Employment Agreement, including, but not limited to, all executed versions of the Employment Agreement and any and all communications regarding the Employment Agreement"; "[a]ll Documents relating to Tinnell's compensation while employed by [CRGT], including, but not limited to, pay-stubs, W-2s and commission reports"; [a]ll Documents relating to DeSmet's request that Tinnell cease taking a salary in December 2023 . . ."; "[a]ll Documents relating to Tinnell's termination and the termination of the [Letter of Intent] . . ."; and documents relating to gross sales, revenues, and new business, facts which would impact his compensation and bonuses under the Employment Agreement. *See* [R. 81-2]; [R. 23-2, ¶ 4 (discussing compensation)].

Indeed, to the extent Tinnell relied on the Employment Agreement in responding to the motion for preliminary injunction, his focus was primarily on the agreement's confidentiality and non-compete provisions, not those provisions relating to his compensation. *See* [R. 33, pp. 18–22]; [R. 50, 9:1–19]. Yet, as noted above, he clearly went beyond these arguments in discovery, seeking information relating to his compensation under the Employment Agreement. *See* [R. 81-1 (DeSmet Deposition Excerpt)]; [R. 81-2 (Tinnell's Requests for Production of Documents, Requests Nos. 1–6)]; [R. 81-4 (Brian Pierson Deposition Excerpt)]. True, Tinnell briefly argued that CRGT could not benefit from that agreement, or in other words, from demonstrating that Tinnell violated those confidentiality and non-compete provisions, because it had first breached the agreement by failing to pay Tinnell. *Id.* at 22–23. But importantly, CRGT did not rely on the existence or terms of the Employment Agreement in its complaint or its request for injunctive relief. *See* [R. 1]; [R. 38]; [R. 50, 225:11–24 (counsel for CRGT stating that their position was that the Employment Agreement was not in place and also noting that Tinnell's counsel had used the expedited

- 19 -

discovery to "focus[] on things they think relate to their defenses")]; [R. 33, p. 18 (acknowledging that CRGT's "Motion and Complaint both fail to address the Employment Agreement")]. Its basis for relief has always stemmed from the Mutual Confidentiality Agreement, among other things. *See* [R. 1]; [R. 38]; [R. 50, 226:7–17, 227:10–11 ("[W]e have not asserted a claim under the employment agreement.")]. It was Tinnell who first brought the Employment Agreement into this litigation, by asserting his counterclaims for CRGT's alleged failure to compensate him under that agreement. Thus, from the best the Court can tell, Tinnell's attempts to utilize the expedited period of discovery to develop his counterclaims could be viewed as an attempt to gain a tactical advantage early in the proceedings. Such behavior weighs in favor of finding waiver. *See Schwebke*, 96 F.4th at 977.

Given the scope and volume of the discovery in this case, including 180,000 documents produced by Tinnell and eight depositions, this case is more like *Schwebke* than *Johnson*. *See Schwebke*, 96 F.4th at 975 (noting that the defendants had produced tens of thousands of pages of documents in discovery, produced witnesses for deposition and participated in depositions, issued fourteen third-party subpoenas, filed a witness list, and agreed to an extension of the discovery deadlines); *Johnson*, 2025 WL 3252399, at *4 (noting that "some discovery had been exchanged between the parties," including the production of over 1,000 pages of documents, written discovery requests, and a single third-party subpoena, but finding that these facts differed from those in *Schwebke*).

This brings the Court to another important factor: "whether the party [seeking to compel arbitration] made any 'affirmative requests for relief' before moving to compel arbitration." *Johnson*, 2025 WL 3252399, at *4 (citing *Schwebke*, 96 F.4th at 975–76). For example, "[a] dispositive motion affirmatively asks the district court to exercise power and decide an issue."

- 20 -

*Schwebke*, 96 F.4th at 976. "A counterclaim," on the other hand, "while adding a claim into existing litigation, affirmatively requests relief only in the broadest sense." *Id.* The Sixth Circuit has explained, however, that "the extent to which asserting a counterclaim is inconsistent with arbitration depends, in part, on whether the counterclaim is permissive or compulsory." *Id.* If a counterclaim is permissive, "the party is willfully expanding the scope of litigation." *Id.* But if a counterclaim is compulsory, "the party is required to respond to the litigation or waive the right to bring that claim." *Id.* Such "responsive conduct is less relevant to the analysis than affirmative conduct." *Id.* (citation omitted). To be clear, however, a party's assertion of a compulsory counterclaim can weigh in favor of finding waiver. *See Johnson Associates*, 680 F.3d at 718–719 (finding that the party's filing of a counterclaim, when considered with other factors, such as its failure to raise arbitration as an affirmative defense and its participation in litigation, supported a finding of waiver); *Schwebke*, 96 F.4th at 976 ("In *Johnson Associates*, the counterclaim was compulsory.").

In the present case, while Tinnell has not filed any dispositive motions (like a motion to dismiss or motion for summary judgment), he *has* filed counterclaims. *See Johnson*, 2025 WL 3252399, at *5 ("HCL has not filed any dispositive motions *or counterclaims* in this action, which Courts have found weigh heavily in favor of finding waiver." (citation omitted) (emphasis added)). The Court therefore considers whether these counterclaims are compulsory or permissive. To answer this question, the Court looks first to Federal Rule of Civil Procedure 13, which provides in relevant part that "[a] pleading must state as a counterclaim any claim that—at the time of its service—the pleader has against an opposing party if the claim . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a)(1)(A). The Sixth Circuit has explained, however, that "[r]ather than look to whether the original claim

and counterclaim literally arise out of the same transaction or occurrence," courts should ask whether "there is a logical relationship between the two claims." *Findlay Recovery Center LLC v. Thomas*, No. 3:24-cv-00940-JGC, 2025 WL 1218037, at *3 (N.D. Ohio Mar. 31, 2025) (quoting *Bauman v. Bank of Am., N.A.*, 808 F.3d 1097, 1101 (6th Cir. 2015)) (internal quotation marks omitted). This, in turn, requires courts to "determine whether the issues of law and fact raised by the claims are *largely the same* and whether *substantially the same* evidence would support or refute both claims." *Id.* (quoting *Bauman*, 808 F.3d at 1101) (internal quotation marks omitted). However, "[a] partial overlap in issues of law and fact does not compel a finding that two claims are logically related." *Id.* (quoting *Bauman*, 808 F.3d at 1101) (internal quotation marks omitted).

Here, CRGT's claims arise from Tinnell's alleged misappropriation and misuse of confidential information and trade secrets during and after his employment with CRGT, in violation of state and federal law and in breach of the Mutual Confidentiality Agreement. *See generally* [R. 1]. Tinnell's counterclaims relate to CRGT's alleged failure to pay his compensation in violation of other state statutes and in breach of the Employment Agreement. *See generally* [R. 23, pp. 49–51]. While there may be a "partial overlap in issues and law and fact," the issues of law and fact raised by the claims and counterclaims do not appear to be "largely the same" or depend on "substantially the same evidence." *Findlay*, 2025 WL 1218037, at *3. Moreover, courts within this circuit have held that "the mere existence of an employment relationship 'is not enough to demonstrate the existence of a 'logical relationship' between the [claims and counterclaims] for purposes of Rule 13." *Id.* at *4 (collecting cases). Here, CRGT's claims and Tinnell's counterclaims arise out of their employment relationship. "But the two sets of claims address different issues of law and fact and do not rest on substantially the same body of evidence." *Id.* Indeed, the parties' claims rely on two different contracts, with CRGT relying in part on the Mutual

- 22 -

Confidentiality Agreement and Tinnell relying on the Employment Agreement. The Court therefore finds that Tinnell's counterclaims are permissive, not compulsory. In asserting these counterclaims, he chose to expand the scope of this litigation to include those claims, and he did so without putting CRGT on notice of his intent to arbitrate those claims. This weighs in favor of finding waiver. Moreover, even if Tinnell's counterclaims are compulsory, the totality of the circumstances would still weigh in favor of finding waiver. *See generally Johnson Associates*, 680 F.3d at 718–719.

Importantly, there is no bright line rule to guide the Court in deciding this motion; instead, the Court looks to the totality of the circumstances. *Johnson*, 2025 WL 3252399, at *4 (citing *Schwebke*, 96 F.4th at 975). Here, for all of the reasons outlined above, the totality of the circumstances weighs in favor of finding waiver. Specifically, the Court has considered "when and how [Tinnell] raised the arbitration issue," including Tinnell's failure to raise it as an affirmative defense; "the overall progress of the case when [Tinnell] filed the motion to compel arbitration," including the voluminous discovery clearly targeted at his counterclaims; and Tinnell's decision to effectively expand this litigation by raising his permissive counterclaims in this Court. *See generally id.* (reciting factors that courts typically consider (citing *Schwebke*, 96 F.4th at 975–76)). Simply put, considering the totality of the circumstances, the Court finds that Tinnell has acted inconsistent with his reliance on an arbitration agreement, and on balance, these facts weigh in favor of finding waiver and denying the Motion to Compel Arbitration. Because, even assuming the Employment Agreement is valid and enforceable, Tinnell has waived his right to invoke the

arbitration provision, the Court need not consider the parties' arguments about the validity of that agreement at this time.[8]

One final point. Tinnell repeatedly emphasizes the federal policy in favor of arbitration. *See* [R. 82, pp.14–15]. True, the FAA has a policy favoring arbitration. *See Parker v. Tenneco, Inc.*, 114 F.4th 786, 792 (6th Cir. 2024) (discussing the FAA's policy). For years, federal courts relied on that policy to reason that a "waiver of the right to arbitrate 'is not to be lightly inferred.'" *Morgan*, 596 U.S. at 417 (quoting *Carich v. Rederi A/B Nordie*, 389 F.2d 692, 696 (2d Cir. 1968)). As a result, those courts, including the Sixth Circuit, were reluctant to find waiver unless the party opposing arbitration would suffer prejudice. *See id.* at 417–18; *Schwebke*, 96 F.4th at 974 (discussing *Morgan*). But the Supreme Court recently clarified that the FAA's policy in favor of arbitration "does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Morgan*, 596 U.S. at 418 (citation omitted). Instead, this policy "is merely an acknowledgement of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Id.* (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010)) (internal quotation marks omitted). In other words, "[t]he policy is to make 'arbitration agreements as enforceable as other contracts, but not more so.'" *Id.* (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n.12 (1967)). Put simply, the policy is "not about fostering arbitration," but is instead about "treating arbitration contracts like all others." *Id.* (citations

---

[8] Moreover, even if the Court were to consider the validity of the Employment Agreement, the Court notes that the arbitration provision of that agreement clearly states that the party seeking to arbitrate must give "notice of arbitration to the other party within thirty (30) days after notice of such dispute has been received." [R. 23-2, ¶ 12]. Tinnell did not give notice to CRGT until October 2024, more than thirty days after the filing of CRGT's complaint and Tinnell's own answer and counterclaims. *See* [R. 66, 145:3–8]. Thus, even assuming the Employment Agreement is valid and enforceable, it is not clear that Tinnell timely invoked the arbitration provision.

omitted). Thus, "[i]f an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitration contract, then so be it." *Id.* Here, for all the reasons already stated, the Court finds that the ordinary procedural rule of waiver (or default or forfeiture) counsels against enforcing the arbitration provision at issue here.

### III.    CONCLUSION

For the reasons set forth above, the Court finds that Tinnell waived his right to seek arbitration of his counterclaims. Accordingly, **IT IS HEREBY ORDERED** as follows:

1. Defendant Kenneth Tinnell's Motion to Compel Arbitration, [**R. 79**], is **DENIED**.

2. On or before **Friday, February 14, 2026**, the parties **SHALL** meet and confer and file a Joint Status Report that includes a proposed agreed scheduling order for the remainder of the case. The Joint Status Report **SHALL** also advise of the status of any settlement discussions, including those involving Nova Dry Kiln, LLC, and whether any party wishes to refer the matter to the magistrate judge for another settlement conference.

This the 22nd day of January, 2026.

*Claria Horn Boom*

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF KENTUCKY

cc:    Counsel of Record

- 25 -